## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
## FOURTH DIVISION

UNITED STATES OF AMERICA

ex rel.

JOHN A. SNYDER (RELATOR),

                Plaintiffs,

v.

Critical Care Services, Inc.,
d/b/a Life Link III; Regions Hospital, Health
Partners; Fairview Health Systems; Children's
Health Care; Hennepin County
Medical Center; Allina Hospitals and
Clinics; and St. Cloud Hospital/CentraCare,

                Defendants.

Civil Court File No.: *SC* _07-608 PJS/RLE_

**FALSE CLAIMS ACT**
**COMPLAINT AND DEMAND**
**FOR A JURY TRIAL**

**FILED UNDER SEAL AND**
***IN CAMERA* PURSUANT TO**
**31  U.S.C. § 3730(b)(2)**

**DO NOT PLACE IN PRESS BOX**
**DO NOT ENTER ON PACER OR**
**CM/ECF**

---

Plaintiff John A. Snyder, the Relator, through his attorneys, **JOHN A. KLASSEN, P.A.**,

700 Lumber Exchange, 10 South Fifth Street, Minneapolis, Minnesota 55402, and **WALLEN-**

**FRIEDMAN & FLOYD, P.A.**, 527 Marquette Avenue, Suite 860, Minneapolis, Minnesota

55402, states and alleges for his False Claims Act Complaint as follows:

SCANNED
NOV – 9 2012
U.S. DISTRICT COURT MPLS

### NATURE OF CLAIM

1.    John A. Snyder (the "Relator") brings this action on behalf of the United States of

America against defendants for treble damages and civil penalties arising from the defendants'

false statements and false claims in violation of the Civil False Claims Act, 31 U.S.C. §§

3730(b)(2).  The violations arise out of defendants' false billings for reimbursement from

Medicare for services it is not licensed by the State of Minnesota to perform, and defendants'



false claims to Medicare for billing for non-covered medical transport services and/or upcoded services.

2.      As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), the Relator has provided to the Attorney General of the United States, and to the United States Attorney for the District of Minnesota, a statement of all material evidence and information related to the Complaint.  This disclosure statement is supported by material evidence known to the Relator at the time of his filing establishing the existence of defendants' false claims.   Because the statement includes attorney-client communications and work product of the Relator's attorneys, and is submitted to the United States Attorney General and to the United States Attorney in their capacity as potential co-counsel in this litigation, the Relator understands and intends this disclosure to be confidential.

3.      Pursuant to the False Claims Act, 31 U.S.C. § 3730(e)(4)(B), on January 5, 2007, and prior to filing this Complaint, the Relator met with a federal agent employed by the United States Department of Health and Human Services, Office of Inspector General, Office of Investigations, and voluntarily provided oral and documentary evidence to the federal agent of the bases for these claims against Defendants. Further submissions were made by the Relator to the OIG on January 24 and 26, 2007.  This evidence known to the Relator and provided to the federal agent on those dates includes work product of Relator's attorneys, and is submitted to the Office of Inspector General, the United States Attorney General and to the United States Attorney in their capacity as potential co-counsel in this litigation, and the Relator understands and intends this disclosure to be confidential.

## JURISDICTION AND VENUE

4.      This actions arises under the False Claims Act, 31 U.S.C. §§ 3729 et seq.  This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b) and because at least one of the defendants resides or transacts business in this District.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1345 and 28 U.S.C. § 1331.

5.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the acts proscribed by 31 U.S.C. §§ 3729 et seq. and complained of herein took place in this District, and is also proper pursuant to 28 U.S.C. § 1391(b) and (c), because at all times material and relevant, at least one of the defendants resides or transacts business in this District.

## PARTIES

6.      Relator John A. Snyder is an adult male who now and at all times relevant was a resident of the State of Minnesota and is a citizen of the United States. At all times material herein, Relator was an "employee" of Critical Care Services, Inc., d/b/a Life Link III.  The Relator brings this action based on his direct, independent, and personal knowledge and also on information and belief.

7.      Relator is an original source of this information to the United States. He has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the United States Government before filing an action under the False Claims Act which is based on the information.

8.      Defendant Critical Care Services, Inc., d/b/a Life Link III ("Defendant Life Link" or "Life Link III"), is a Minnesota non-profit corporation  and at all times material to this lawsuit was and is the employer of the Relator.  Defendant Life Link is a consortium-owned medical

transportation company providing ground and air medical transportation services in the State of Minnesota.

9.     Defendants Owners/Directors are the following Minnesota entities which make up Defendant Life Link's ownership consortium: Regions Hospital, Health Partners, Allina Hospitals and Clinics, Children's Health Care, Children's Hospitals and Clinics, Fairview Health Systems, Hennepin County Medical Center, and St. Cloud Hospital/Centracare. Each of these entities is named as a defendant in this action and is hereinafter collectively referred to as the Defendants Owners/Directors. As owners and shareholders of Defendant Life Link III, each of the Defendants Owners/Directors listed above has designated one or more representatives from its organizations be a board member on the Board of Directors of Life Link III and each of the defendants, by and through its director representatives, has been actively involved in and is responsible for the management and oversight of the operations of Defendant Life Link during all time periods relevant to this action.

## FALSE CLAIMS ACT

10.    The False Claims Act ("FCA") provides, in pertinent part that:

> (a)     Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; . . . or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,
>
> ***
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

> (b)     For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the

information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

## FACTS

**Relator's Background:**

11.     Relator first became employed by Defendant Life Link in 2004, as the Education Manager.

12.     Prior to joining Defendant Life Link, Relator served as the Medical Review Supervisor for Wisconsin Physician's Service ("WPS") Medicare Part B.   This job required knowledge in the proper procedures and practices for billing and reimbursement under Medicare Part B.

13.     Prior to his work for WPS, Relator worked for over twenty years as a paramedic and registered nurse, in emergency medical services.

**Defendant Life Link's Business Operations:**

14.     Defendant Life Link operates ground and air ambulance and other medical transportation vehicles in the State of Minnesota.  It's registered offices are at:  3010 Broadway Avenue Northeast, Minneapolis, Minnesota 55413.

15.     According to Defendant Life Link's financial records, approximately fifty percent (50%) of its billings are made to Medicare, which then reimburses Defendants for its medical transport services.

16.     The United States, through Medicare Part B, is the party which reimburses Defendants for the services billed to Medicare.

**Defendant Life Link's False Claims for Transports it is Not Legally Permitted to Make:**

17.     Defendant Life Link is licensed to provide inter-facility ambulance transportation and is regulated by the Minnesota Emergency Medical Services Regulatory Board ("EMSRB").

18.     Under Defendant Life Link's current licenses, it may only perform Advanced Life Support ("ALS") and Basic Life Support ("BLS") inter-facility transports in accordance with the strictures of its license and its Schedules of Operations.

19.     Defendant Life Link's License No. 359 allows it to perform ground inter-facility transports under two schedules of operation.

20.     The first schedule of operation strictly limits Defendant Life Link to performing only prearranged *mobile intensive care services* which duplicate in-patient intensive care.  This first schedule specifically excludes from Defendant Life Link's license any ground transports for patients not requiring this level of care during pre-hospitalization transport.

21.     The second schedule of operation strictly limits Defendant Life Link to performing only ALS and BLS inter-facility transports which meet the following criteria:

>    (a)     the destination must be one of the consortium owner hospitals or facilities as defined in the Schedule of Operations, which are limited to Abbott Northwestern Hospital, Regions Hospital, Fairview University Medical Center, and Children's Health Care in Minneapolis; and

>    (b)     Defendant Life Link may only perform the previously defined transports in specific geographic portions of Hennepin and Ramsey Counties, in the State of Minnesota.

22.     The second schedule of operations unequivocally sets forth that Defendant Life Link is not licensed to perform ground transports with origins outside of Hennepin and Ramsey Counties, as well as transports within specified geographic areas of these two counties.

23.     The second schedule of operations also unequivocally sets forth that Defendant Life Link is not licensed to perform ground transports whose destinations are health care facilities, including, for example, nursing homes, other than those owned and operated by the consortium owners specifically listed in the Schedule of Operations.

24.     During the period January 1, 2002 through the present date, Defendant Life Link has performed thousands of ground transports outside of its legal mandate, outside of its licensure, and outside of its schedule of operations.

25.     During this same period, January 1, 2002 through the present date, Defendant Life Link has billed thousands of these illegal ground transports to Medicare, for payment by the United States government. These are services for which Defendants cannot legally seek reimbursement from Medicare, but have anyway.

26.     During this period, Medicare has reimbursed Defendants for thousands of these false claims submitted to it by Defendant Life Link.

27.     Upon knowledge and belief, historically, approximately fifty percent (50%) of Defendant Life Link's ground transports are billed to Medicare, twenty percent (20%) to Medicaid, and the remainder to private insurance.

28.     For example, in January 2005, Defendant Life Link made 215 illegal transports from Fairview Ridges Hospital to other medical facilities in the Twin Cities metro area. These transports are outside of both Defendant Life Link's licensure and the second schedule of operations because the origin of the transports is in Dakota County, which is specifically

excluded as a place of transport origin under Defendant Life Link's license and schedule of

operations. These illegal transports, for which Medicare was statistically falsely billed for

approximately fifty percent of them, which by way of example and without limitation, included

the following individual transports:

    a.    Date:         1/1/05
          Time:         8:02 a.m.
          Unit:         932
          Run No.:      GR01010514152
          Pickup:       Fairview Ridges
          Destination:  Fairview Southdale

    b.    Date:         1/10/05
          Time:         1:22 p.m.
          Unit:         973
          Run No.:      GR050110000250
          Pickup:       Fairview Ridges
          Destination:  Bethesda Hospital HealthEast

    c.    Date:         1/20/05
          Time:         1:22 a.m.
          Unit:         953
          Run No.:      GR01200500628
          Pickup:       Fairview Ridges
          Destination:  Fairview University Medical Center

    d.    Date:         1/31/05
          Time:         10:46 a.m.
          Unit:         934
          Run No.:      GR01310501098
          Pickup:       Fairview Ridges
          Destination:  Bethesda Rehabilitation

29.    These false claims by Defendant Life Link to Medicare continued throughout

2005 and 2006. For example, in September 2006, Defendant Life Link made 234 illegal

transports from Fairview Ridges Hospital to other medical facilities in the Twin Cities metro

area. Again, these were illegal transports, for which Medicare was statistically falsely billed for

approximately fifty percent of them.  By way of example and without limitation, they included

the following individual transports:

a.   Date:            9/1/06
     Time:            9:22 a.m.
     Unit:            931
     Run No.:         GR09010609966
     Pickup:          Fairview Ridges
     Destination:     Fairview Southdale

b.   Date:            9/07/06
     Time:            10:21 p.m.
     Unit:            952
     Run No.:         GR09070610259
     Pickup:          Fairview Ridges
     Destination:     Trevilla of Golden Valley

c.   Date:            9/11/06
     Time:            2:19 p.m.
     Unit:            972
     Run No.:         GR09300611390
     Pickup:          Fairview Ridges
     Destination:     Presbyterian Home Bloomington

d.   Date:            9/19/06
     Time:            3:44 a.m.
     Unit:            953
     Run No.:         GR09190610713
     Pickup:          Fairview Ridges
     Destination:     Ebenezer Ridges

30.   Specific examples of Defendant Life Link's illegal transports which were billed to

Medicare include the following:

a.   Date:            1/24/05
     Billing No.:     A0500821
     Pickup:          Regions Hospital
     Destination:     Lyngblomstein Health Care

b.   Date:            1/24/05
     Billing No.:     A0500810
     Pickup:          Regions Hospital

|   | Destination: | Martin Luther Manor |
|---|---|---|
| c. | Date: | 1/24/05 |
|   | Billing No.: | A0500817 |
|   | Pickup: | Regions Hospital |
|   | Destination: | Lynnhurst Healthcare Center |
| d. | Date: | 12/23/05 |
|   | Billing No.: | A0512360 |
|   | Pickup: | Fairview Southdale Hospital |
|   | Destination: | Elko Hospice |
| e. | Date: | 12/23/05 |
|   | Billing No.: | A0512364 |
|   | Pickup: | Regions Hospital |
|   | Destination: | Wilder West Care Center |

31.     Defendant Life Link's ground transport logs show numerous other examples where the origin and/or destination of the transport was outside of Hennepin or Ramsey Counties, such as at St. Francis Hospital in Scott County, or in Hastings, Minnesota which is in Dakota County.   Again, statistically on average, fifty percent of these illegal transports were billed to Medicare.

32.     The average reimbursement received by Defendants for each type of ground transport billed to Medicare is approximately three hundred fifty dollars ($350).

33.     During the period 2003-2006, there have been an estimated four thousand illegal ground transports by Defendant Life Link originating at the Fairview Ridges facility. Statistically, approximately fifty percent (50%) of these will have been billed to Medicare, resulting in false claims for reimbursement by Defendants during this period in the amount of one million dollars or more.

34.     During the period January 1, 2005 through January 1, 2007, there have been approximately nine thousand illegal ground transports by Defendant Life Link to destination

facilities such as nursing homes and hospitals outside the parameters of its licensure and schedule of operations.

35.     For example, during the period January 1, 2005 through January 1, 2007, Bethesda HealthEast, which is outside of the ownership consortium, had 368 illegal transports to it by Defendant Life Link.  Additionally, during this period, Maplewood Care Center, which is also outside of the schedule of operations and is not part of the ownership consortium, had approximately 70 transports to it by Defendant Life Link.  Further, during this period, Apple Valley Care Center, which is again outside of the ownership consortium and geographically outside of the schedule of operations, had approximately 120 transports to it by Defendant Life Link.  A final example of illegal transports to unauthorized destinations during this period are the approximately 223 transports to North Memorial Hospital.

**Defendant Life Link's False Claims to Medicare Due to Upcoding from ALS to Critical Care:**

36.     A review of Defendant Life Link's ground transport records by Relator also shows it has engaged in the practice of "upcoding" many of its medical transport billings to Medicare from ALS to Critical Care ("SCT"), which results in a higher reimbursement rate to Defendants from Medicare.

37.     For example, and without limitation, Relator's review of Defendant Life Link's clinical documentation and its billing and dispatch records for Defendant Life Link's Milltown, Wisconsin facility, for the period 2003 through 2005, show a grossly inflated percentage of ground transports have been billed, including to Medicare, at the higher SCT claim rate.

38.     The average percentage of ground transports billed as SCT, by a comparable provider to Defendant Life Link, should be approximately 5 to 7% of all claimed ground transports.

39.     However, Defendant Life Link's records show that at its Milltown, Wisconsin facility, in 2003 it billed 54% of its claims as SCT; in 2004 it billed 54% of its claims as SCT; and in 2005 it billed 51% of its claimed transports as SCT.

40.     Relator's review of the clinical documentation supporting the above-listed SCT rated billings show that only 5% of those SCT rated transports had sufficient documentation to support being billed at that higher reimbursement rate.

41.     The average reimbursement received by Defendants for each ground transport billed to Medicare as SCT is approximately $600 dollars, which is an increase of approximately $300 dollars over the ALS billing rate.

42.     Approximately fifty percent of these claims will have been billed to Medicare, resulting in false claims for reimbursement by Defendants during this period in the amount of $600 dollars per false billing.

43.     Upon information and belief, Defendant Life Link has engaged in this practice of upcoding at other facilities owned and operated by it during the period 2002 through the present date.

**Defendant Life Link's False Claims to Medicare Due to Upcoding from ALS Non-emergency to ALS Emergency:**

44.     A review of Defendant Life Link's ground transport records by Relator also shows it has engaged in the practice of "upcoding" many of its medical transport billings to Medicare

from ALS Non-emergency to ALS Emergency, which results in a higher reimbursement rate to Defendants from Medicare.

45.     For example, and without limitation, Relator's review of Defendant Life Link's billing and dispatch records for the period 2003 through 2005, show a grossly inflated percentage of ground transports have been billed, including to Medicare, at the higher ALS Emergency claim rate.

46.     For example, and without limitation, in 2003, Defendant Life Link billed to all payers 409 ALS Non-emergency transports, and 1157 ALS Emergency transports.  Thus, ALS Emergency transports represented 74% of the ALS billings made by Defendant Life Link that year.

47.     The average percentage of ground transports billed as ALS Emergency by a comparable provider to Defendant Life Link should be approximately 5 to 10% of total ALS ground transports.

48.     Defendant Life Link's records show that in 2004 it billed 1174 out of 1782 ALS transports as ALS Emergency (66%), and similarly in 2005, it billed 1091 out of 1745 ALS transports as ALS Emergency (63%).

49.     The average reimbursement received by Defendants for each ground transport billed to Medicare as ALS Emergency is approximately $350 dollars, which is an increase of approximately $125 dollars over the ALS Non-emergency billing rate.

50.     Approximately fifty percent of these claims will have been billed to Medicare, resulting in false claims for reimbursement by Defendants during this period in the amount of $350 dollars per false billing.

51.     Upon information and belief, Defendant Life Link has engaged in this practice of upcoding at all facilities owned and operated by it during the period 2002 through the present date.

**Defendant Life Link's Knowing and Reckless Submission of False Medicare Claims:**

52.     In October 2005, upon first learning of the potential unlawful billing practices of Defendant Life Link, the Relator brought his concerns to his superior, Kelly Spratt, Defendant Life Link's Chief Operating Officer.

53.     Relator communicated to Spratt his concerns about Defendant Life Link's CEO, Andrew Kirchoff's, failure to implement a 2003 Medicare Compliance Program, Kirchoff's failure to implement the recommendations of an auditor after a 2002 Medicare audit, denial of access for the Quality Manager to the billing department in order to ensure verification of quality measures and controls, aberrant billing practices at Defendant Life Link such as recreation of clinical documentation in order to justify billings, the absence of billing department quality measures and monitoring controls, and the complete absence of an active Medicare compliance program.

54.     Relator's concerns expressed to Spratt in October 2005 were intended to put Kirchoff on notice that Defendant Life Link's conduct was resulting in the high probability of errors in billing due to the absence of a compliance plan, upcoding, and billing for services where there was a lack of medical necessity.

55.     On November 8, 2005, at a management meeting, the Relator again raised the issue of Defendant Life Link's billing practices.  This led to a meeting on November 18, 2005, with the Relator, Kirchoff, Spratt, the Controller, the Billing Department Supervisor, and the Quality Manager.   The Relator's concerns about Defendant Life Link's billing practices and

Medicare compliance were again raised to Defendant Life Link's senior management. Defendant Life Link then assigned the Quality Manager to conduct an audit, which she completed in December 2005.

56.     This audit showed no processes and quality measures were in place to prevent irregularities in billing practices at Defendant Life Link (including Medicare billing), the absence of an internal monitoring system and quality review, and the high probability of billing errors in claims submitted to Medicare and other payers.

57.     In the weeks after December 2005, the Quality Manager reported to the Relator that her audit and its recommendations were being quashed by Defendant Life Link's senior management and no corrective action was to be taken by Defendant Life Link in the wake of the audit to fix the problems Relator had reported to management.

58.     At that time, Defendant Life Link's Quality Manager also reported to the Relator that she was prohibited by senior management from conducting a review into past paid claims, including paid Medicare claims, in order to identify whether there were false billings and payments.

59.     Because of the aforementioned problems with Defendant Life Link's billing practices which Relator was discovering, he urged senior management to retain a law firm specializing in EMS billing compliance issues. This suggestion was refused by Defendant Life Link's senior management.

60.     The Relator also urged senior management to form a Compliance Workgroup at Defendant Life Link to help prevent these false billing issues. Again, senior management refused.

61.     In late 2005 and early 2006, the Relator began uncovering facts which showed Defendant Life Link was billing Medicare and other payers for transport services which it was prohibited from performing under its licensure and schedules of operations, as previously set forth in Paragraphs 20-35 of this Complaint.

62.     Relator brought his concerns about this pattern of reimbursement for services outside of Defendant Life Link's legal medical transport licensure and schedule of operations to both COO Spratt and CEO Kirchoff. During the period December 2005 through June 2006, in multiple conversations Relator had regarding his aforementioned concerns, COO Spratt's responses to Relator was that the issue would not be addressed for "political reasons," and CEO Kirchoff's responses included, "We will not go there," and "It is not a problem," and "We are not going to open that can of worms."

63.     In June 2006, it was reported to the Relator by the Quality Manager that Defendant Life Link's billing staff regularly billed transport claims to Medicare that they knew were not payable because the services failed to meet the "medical necessity" requirements under law.  The billing staff's response to questions about this practice was that Defendant Life Link "bills them anyway because we know they will get paid" by Medicare.

64.     These unlawful billing practices and Medicare compliance failures at Defendant Life Link were raised by the Relator at meetings with the Controller and Billing Supervisor on June 29, 2006, at a meeting with COO Spratt on June 30, 2006, and in a July 2, 2006 email from Relator.  None of these communications resulted in corrective action or remedial steps by Defendant Life Link.

65.     After nearly seven months of attempting to report and effect internal changes to Defendant Life Link's unlawful Medicare billing practices, the Relator reported his concerns to WPS Medicare Part B on July 15, 2006.

66.     On August 30, 2006, Relator sent CEO Kirchoff an email setting out his concerns regarding transports outside of Defendant Life Link's licensure and schedule of operations.  On September 5, 2006, Kirchoff responded by email, stating, "John, please speak with me."

67.     On September 5, 2006, Kirchoff met with and told Relator, "absolutely we will not attempt to change the schedule of operations" in order to address Relator's concerns.

**The Defendants Owners/Directors Knew or Should Have Known of the False Claims:**

68.     For all times relevant to this action, each of the owners of Defendant Life Link, the Defendants Owners/Directors, has designated one or more of its own officers, employees or representatives to sit as a director on the Board of Directors of Defendant Life Link. For example, in 2005, the Board of Directors was comprised of owner representatives from Regions Hospital, United Hospital, Fairview Southdale Hospital, Children's Hospitals and Clinics, Hennepin County Medical Center, Allina Hospitals, Fairview-University Medical Center, and St. Cloud Hospital.

69.     For all times relevant to this action, each of the Defendants Owners/Directors, by and through their director representatives, has taken an active role in overseeing the operations and management of Defendant Life Link. In particular, the Defendants Owners/Directors by and through the Board of Directors, were or should have been informed of the serious billing errors reported to Defendant Life Link in the Compliance Concepts, Inc. ("CCI") retroactive claims audit report and letter dated January 21, 2003, which resulted in Defendant Life Link adopting the Life Link III Corporate Compliance Plan For 2003 (the "2003 CCP").

70.     Upon information and belief, the Board of Directors knew or should have known of the CCI audit report and the 2003 CCP and subsequently failed as owners of Defendant Life Link, by and through its Board representatives, to ensure that the 2003 CCP was carried out. Indeed, the 2003 CCP acknowledges the need for Board involvement in Defendant Life Link's management of the CCP, when it states that under certain circumstances an emergency change to the CCP "shall be reported to the Board at its next regularly scheduled meeting." However, upon information and belief, from 2003 through 2006, the Defendants Owners/Directors acted in deliberate ignorance of the truth or falsity of the information or acted in reckless disregard of the truth or falsity of the information and thus, each of the Defendants Owners/Directors "knowingly" participated in the pervasive and systematic false and fraudulent billing by Defendant Life Link.

71.     Robert Frascone, M.D., of Defendant Owner/Director Regions Hospital, not only has served as a Defendant Life Link board member during the period 2005 through the present date, but he was also employed during this period as Defendant Life Link's Medical Director. During this period, Frascone was and is a senior management employee of both Defendant Life Link and Regions Hospital, with responsibility for overseeing all of Defendant Life Link's patient care activities, including ground transports and billing.  In this dual capacity, Frascone and the Defendants Owners/Directors knew or should have known about Defendant Life Link's operations outside of its license and schedule of operations, as well as the aberrant billing practices and lack of Medicare compliance at the company.

72.     On or about September 2006, Relator expressed his concerns about the aforementioned Medicare billing practices of Defendant Life Link to board member William Heegaard, M.D., of Hennepin County Medical Center.  This meeting lasted over one hour.

Relator expressed to Heegaard that he believed Defendant Life Link was not in compliance with federal law in regard to Medicare billing and that senior management was aware of it and had done nothing to correct the problems. Heegaard offered no response to these concerns, other than to criticize the Relator for being "too hard" on CEO Kirchoff.  Heegaard never followed up with the Relator on these issues.

73.    During the period 2005 through the present date, Heegaard has also been employed by Defendant Life Link as a "co-medical director."  During this period, Heegaard was and is a senior management employee of both Defendant Life Link and Hennepin County Medical Center, with co-responsibility for overseeing all of Defendant Life Link's patient care activities, including ground transports and billing.  In this dual capacity, Heegaard and the Defendants Owners/Directors knew or should have known about Defendant Life Link's operations outside of its license and schedule of operations, as well as the aberrant billing practices and lack of Medicare compliance at the company.

74.    Despite notice to the Defendants Owners/Directors, Defendant Life Link continues to the present date to perform medical transports which are prohibited by its licensure and schedule of operations, as well as engage in the practice of upcoding of its services.

75.    Despite the Defendants Owners/Directors' direct knowledge of the unlawful transports and the aberrant billing practices of Defendant Life Link, Medicare continues to be billed for reimbursement of these false claims.

76.    Since Relator's disclosure to Board member Heegaard in September 2006 of the aforementioned Medicare compliance issues at Defendant Life Link, the Board of Directors of Defendant Life Link, comprised of senior employees of Defendants Owners/Directors, has not

discussed this issue at any board meeting as memorialized by board minutes for each board meeting held since September 2006.

77.     As a direct and proximate result of Defendants' false claims to Medicare, the United States Government has been damaged.

## COUNT ONE
### FALSE CLAIMS ACT VIOLATIONS
### 31 U.S.C. § 3729(a)(1) and (a)(2)

78.     Relator realleges the foregoing paragraphs as though fully set forth herein.

79.     Defendants, by and through their officers, agents, supervisors, board members, owners, shareholders and employees, knowingly presented or caused to be presented to the United States Government, through Medicare, false claims for payment of medical transport services, in violation of 31 U.S.C. § 3729(a)(1).

80.     Defendants, by and through their officers, agents, supervisors, board members, owners, shareholders and employees, knowingly made, used, or caused to be made or used, false records or statements to get false claims paid or approved by the United States Government, through Medicare, for payment of medical transport services, in violation of 31 U.S.C. § 3729(a)(2).

81.     Defendants, by and through their officers, agents, supervisors, board members, owners, shareholders and employees, authorized the various officers, agents, supervisors, and employees of Defendant Life Link to take the actions set forth above and below.

82.     Defendants knowingly hid and otherwise failed to disclose to the United States and Medicare their violations of Defendant Life Link's licensing and schedule of operations strictures, and represented to the United States Government and Medicare that the transport services for which Defendant Life Link billed Medicare were in conformance and compliance

with its licensure and schedule of operations. This resulted in the submission of false claims for payment to the United States Government through Medicare.

83.    Defendants also knowingly falsely represented the transport services for which Defendant Life Link billed the United States Government and Medicare for reimbursement to be of a different type of service than actually was performed, and/or should have been performed given the clinical documentation on the transport. This is evidenced, for example, by Defendant Life Link's practice of labeling transports as Critical Care which were actually ALS, and of labeling transports as ALS Emergency which were actually ALS Non-emergency.

84.    The "upcoding" of thousands of Defendant Life Link's medical transports was made by Defendants for the purpose of obtaining payments from the United States Government and Medicare to which Defendants would not otherwise have been entitled.

85.    These actions by Defendants resulted in the submission of false claims for payment to the United States Government and Medicare.

86.    Defendants' course of conduct violated the False Claims Act, 31 U.S.C. §§ 3729 et seq.

87.    The United States has been damaged as a result of Defendants' violations of the False Claims Act to the extent that the United States, unaware of the falsity of the claims and/or statements of Defendants, and in reliance on the accuracy thereof, paid for services for which Defendants were not entitled to reimbursement through Medicare.

## PRAYER FOR RELIEF

**WHEREFORE,** Relator, on behalf of himself and the United States Government, respectfully prays:

A.      That this Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions;

B.      That this Court impose on Defendant a civil penalty of $5,500 to $11,000 for each action in violation of 31 U.S.C. §§ 3729 et seq.;

C.      That this Court order Defendants to pay the costs of this litigation, with interest, incurred by both the Relator and the United States Government;

D.      That the Relator be awarded all costs incurred, including reasonable attorneys' fees;

E.      That, in the event the United States Government continues to proceed with this action, the Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action or settlement of the claim;

F.      That, in the event the United States Government does not proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be not less than 25% nor more than 30% of the proceeds of the action or settlement of the claim;

G.      That the Relator be awarded prejudgment interest; and

H.      That the United States Government and the Relator receive all relief, both in law and in equity, to which they may reasonably appear entitled.

## JURY DEMAND

Relator, on behalf of himself and the United States Government, hereby demands a trial by jury of all issues triable of right by a jury.

**JOHN A. KLASSEN, P.A.**

Date:_____1/30/07_____

_____
John A. Klassen
(Atty. Reg. No. 24434X)
700 Lumber Exchange
10 South Fifth Street
Minneapolis, Minnesota  55402
(612)  204-4533

**WALLEN-FRIEDMAN & FLOYD, P.A.**

_____
Paul M. Floyd
(Atty. Reg. No. 0147953)
Leny K. Wallen-Friedman
(Atty. Reg. No. 233894)
860 Rand Tower
527 Marquette Avenue South
Minneapolis, Minnesota 55402
(612) 399-0773
(612) 341-9893

**ATTORNEYS FOR PLAINTIFF AND RELATOR JOHN A. SNYDER**

*Filed Under Seal and In Camera* *

07-SC-608

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
United States ex rel. John A. Snyder

## DEFENDANTS
Critical Care Services, Inc., et al.

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Hennepin
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
John A. Klassen, P.A.
10 S. 5th St., #700
Mpls MN   612-204-4533

Paul Floyd  612-339-0773
860 Bard Center
Mpls MN 55402

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☑ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
31 U.S.C. §3729 et seq
Brief description of cause:
False Claims Act claim for Medicare fraud

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $  75,000 +

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions:)
JUDGE _____   DOCKET NUMBER _____

DATE  1/30/07

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # ___   AMOUNT ___   APPLYING IFP ___   JUDGE ___   MAG. JUDGE ___